Cary and another vs. Allen and another.

CARY and another vs. ALLEN and another.

LIBEL. *(1) Requisites of complaint where words charged are of uncertain meaning. (2, 3) What words are libelous.*

1. In an action for libel, where it is uncertain what words charged mean,

Cary and another vs. Allen and another.

and to whom they refer, the complaint should contain averments show-
ing their meaning and their reference to the plaintiff.

2. Words which have a direct tendency to injure a person in reputation, to
degrade and disgrace him in society, and to bring him into public con-
tempt and ridicule, are libelous.

3. Defendants, in a newspaper article, after stating the defalcation, frauds
and disappearance of one H., said: "It is currently rumored that Mrs.
B. [one of the plaintiffs] has gone with H., or has some connection with
his disappearance. It is said that Mrs B. left shortly before H.'s depart-
ure, ostensibly for the purpose of visiting Washington, and since that
time her family have telegraphed to her and for her repeatedly, but can
receive no tidings whatever of her whereabouts. H. was known to have
possession of considerable of her money at the time he absconded, and
the fact of her leaving and subsequent reticence, coupled with this, has
given rumors to the effect that they had concocted a scheme to meet at
some appointed time and place, and have gone together. For the lady's
sake it is but proper to give but little credence to such a suspicion, until
further developments shall prove it well founded." *Held*, libelous.

APPEAL from the Circuit Court for *Winnebago* County.
Action for libel, originally brought by *Mrs. Florence A.
Beckwith*, who subsequently intermarried with one *Cary*,
who was then joined as a plaintiff in the suit. The complaint
alleged that the defendants *Allen* and *Hicks* were editors,
proprietors and printers of the "Daily Northwestern," a
daily newspaper published in the English language, in the
city of Oshkosh, and of general circulation in that city; that
plaintiff was the widow of the late Nelson Beckwith (men-
tioned in the article hereinafter set forth), and that she was a
single woman and had been such since the death of her hus-
band; and that defendants published, issued and put in circu-
lation in the daily issue of their said paper the following
article:

"DEEPER DYED."

"The A. H. Howard matter deepening into dark deeds. For-
gery discovered. Grave suspicions of a woman at the bot-
tom of it.

"The more the affairs of Asa H. Howard are developed into,

and the deeper down the investigations are pushed, and the more that circumstances divulge, the more astounding are the facts and figures brought to light, until a clear case of the most hellish and diabolical fraud is unearthed that ever afflicted this part of the country. To add to the barefaced robbery which has wrung from the widow her little mite, and from the laborer his little all, and the farmer his hard earned gains, comes the stinging revelation that he has betrayed his friends, swindled his associates, deserted his family, and criminated himself under the garb of extraordinary piety, and through the hypocritical professions of morality, virtue and religion. And the matter is more stinging to those who have been gulled, from the fact that they allowed him to pull the wool over their eyes by a show of such virtues.

"It now transpires that he has left behind him the evidences of forgery to increase still the weight of his enormities. A Mr. Brown, of Berlin, now presents a note for $1,800, made out by A. H. Howard, payable to G. W. Shaffer, indorsed by Shaffer, and the name of W. W. Race written across the face. Mr. Brown, or rather his daughter, Mrs. Beckwith, it appears, bought this note of A. H. Howard, or took it as security, and now demands payment from the indorsers of the same. Both Mr. Shaffer and Mr. Race positively declare the note a forgery, and decline to pay it. We are informed, however, on good authority, that the law will compel them to pay it, the note now being in an innocent party's hands. How many more of such notes or papers may yet turn up, it is, of course, impossible to tell. The liabilities begin to accumulate so fast that it is now figured up that the total liabilities on debts and deposits will not fall short of $65,000.

"There is another phase of the affair which is growing current in rumor and belief, and that is, that there is a woman mixed up in it. Were it not already the theme of conversation in Omro, we would desist of a mention of it, as we can look upon it at present only in the light of groundless appre-

hension.   It is currently rumored that Mrs. Beckwith, widow
of the late Hon. Nelson Beckwith, has gone with Howard, or
has some connection with his disappearance.   It is said that
Mrs. B. left shortly before Howard's departure, ostensibly for
the purpose of visiting Washington, and since that time her
family have telegraphed to her and for her repeatedly, but can
receive no tidings whatever of her whereabouts.   Howard was
known to have possession of considerable of her money at the
time he absconded, and the fact of her leaving, and subse-
quent reticence coupled with this, have given rumors to the
effect that they had concocted a scheme to meet at some ap-
pointed time and place, and have gone together.   For the lady's
sake, it is but proper to give but little credence to such a sus-
picion, until further developments shall prove it well founded."

The complaint further alleged that the Mrs. Beckwith men-
tioned in said article was the plaintiff, and that all reference
therein to Mrs. Beckwith was intended for her and for no
other person; that every portion of the article referring to
plaintiff was false and malicious, except the statement therein
that " Mr. Brown, or rather his daughter *Mrs. Beckwith*, it
appears, bought this note of A. H. Howard, or took it as secu-
rity, and now demands payment of the indorsers," and the
words, " Howard was known to have possession of considera-
ble of her money at the time he absconded;" that said publi-
cation by defendants was malicious, and by reason thereof
plaintiff had been brought into great public scandal and dis-
grace, and greatly injured in her good name and reputation,
and otherwise injured, to her great damage.   The second count
of the complaint contained the same allegations, and was for
a publication of the same article in the weekly issue of defend-
ants' paper.

The answer denied the malice, and set up facts in mitigation
of damages.

Upon the trial, defendants objected to the introduction of
any evidence, because the complaint did not state a cause of

action. The court sustained the objection, and dismissed the complaint; and the plaintiffs appealed.

*Gabe Bouck*, for appellant:

1. A publication which tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame or disgrace upon him, or which tends to hold him up to scorn, ridicule or contempt, or which is calculated to render him infamous, odious or ridiculous, is *prima facie* a libel, and implies malice in the publication. 1 Hill. on Torts, 266; Add. on Torts, 777; Town. on Slander, sec. 22 and notes; *White v. Nicholls*, 3 How. (U. S.), 266; *Cramer v. Noonan*, 4 Wis., 231; *Lansing v. Carpenter*, 9 id., 540; *Brown v. Remington*, 7 id., 462. So, also, is every publication injurious to private character (Add. on Torts., 776; *Dunn v. Winters*, 2 Humph., 512; *Melton v. State*, 3 id., 389); or that reflects upon character (*O'Brien v. Clement*, 15 M. & W., 435; *Johnson v. Stebbins*, 5 Ind., 364); or that injures social character (1 Am. Lead. Cas., 138); or that induces an ill opinion (*Hillhouse v. Dunning*, 6 Conn., 391); or that imports a bad reputation. *Cooper v. Greeley*, 1 Denio, 347. So with all defamatory words, injurious in their nature. *Chaddock v. Briggs*, 13 Mass., 248. 2. In construing a publication alleged to be libelous, the scope and object of the entire article are to be considered, and such a construction is to be put upon the language as would naturally be given it. The test is, whether to the mind of an ordinary person the tenor of the article and the language used naturally import disgrace. *More v. Bennett*, 48 N. Y., 472. And it is only where the words do not, of themselves, fairly charge the offense, that extrinsic averments are necessary. *Cooper v. Greeley, supra; More v. Bennett, supra; Croswell v. Weed*, 25 Wend., 621.

*C. W. Felker*, for respondents:

There is no averment or *colloquium* showing that Howard and *Mrs. Beckwith* went away together for any criminal, unlawful or illicit purpose. When the publication does not

impute a crime, and the language is not actionable *per. se,* the writing must be such on its face as to tend to bring the party into public hatred, contempt or ridicule.  Unless the nature of the charge is such that the court can see and legally presume that plaintiff has been held up to contempt or ridicule, or that she has suffered loss to her character or business, plaintiff must aver such special damage as she has sustained by reason of the falsity of the publication.  *Stone v. Cooper,* 2 Denio, 293; *Pugh v. McCarty,* 40 Ga., 444; *Bennett v. Williamson,* 4 Sandf., 60.  The article in question charges nothing against *Mrs. Beckwith,* except that she went away with Howard.  It does not impute anything disgraceful or criminal to her.  In actions for libel the language is to be construed as decent, fair minded, and intelligent men would construe it. There being no extrinsic averments showing that it was improper for plaintiff to go away with Howard, there is nothing in the complaint tending to show that the article would excite any feeling but that of pity or compassion for the plaintiff; and for this the action will not lie without an averment of special damage.  *Mayrant v. Richardson,* 1 N. & McC., 348; *Boynton v. Remington,* 3 Allen, 397.

COLE, J.  We think the publication set forth in the complaint is libelous.  It is not clear upon its face that it charges the plaintiff with being connected with or implicated in the frauds and crimes committed by Howard.  There is considerable ambiguity in the language used in the commencement of the article, and it is doubtful what it means, or to what it refers.  The ambiguity might have been explained by a proper averment or colloquium making clear what is doubtfully expressed.  The article commences as follows:  "Deeper Dyed. The A. H. Howard matter deepening into dark deeds.  Forgery discovered.  Grave suspicions of a woman at the bottom of it."  The article then proceeds to speak of the affairs of Howard, and to comment on his crimes, frauds and mis-

conduct as brought to light by the investigations. But whether the article means to charge that a woman — and that woman the plaintiff,— was at the "bottom" of all these frauds and crimes as an instigator or accomplice, or whether it only means that a woman was in some way connected with Howard's matter, it is difficult to say. But if it was intended to claim that the publication charged the plaintiff, *Mrs. Cary*, with being connected with the forgery and other crimes of Howard as a confederate or instigator, it seems to us that correct pleading required an averment or colloquium " to ascertain that to the court which is generally or doubtfully expressed," and to show that the language referred to the plaintiff. See *Van Vechten v. Hopkins*, 5 Johns., 211; *Cramer v. Noonan*, 4 Wis., 231; *Brown et al. v. Remington*, 7 id., 462. As the complaint now stands, it is uncertain what these words mean, and to whom they refer.

But, passing from this point, we think the publication is clearly libelous on the ground that it has a direct tendency to injure the female plaintiff in her reputation, to degrade and disgrace her in society, and to bring her into public contempt and ridicule. Says Chief Justice WHITON, in *Cramer v. Noonan, supra:* "We understand from all the authorities, that a malicious publication which accuses one of a crime, or blackens his character, and exposes him to public hatred, contempt and ridicule, is libelous." *Lansing v. Carpenter*, 9 Wis., 541. That such is the nature and effect of the publication under consideration, must be apparent on slight examination. For the article proceeds to state; in substance, that " it is currently rumored that *Mrs. Beckwith*, the widow of the late Hon. Nelson Beckwith, has gone with Howard, or has some connection with his disappearance. It is said that *Mrs. B.* left shortly before Howard's departure, ostensibly for the purpose of visiting Washington, and since that time her family have telegraphed to her and for her repeatedly, but can receive no tidings whatever of her whereabouts. Howard was known

to have possession of considerable of her money at the time he absconded, and the facts of her leaving and subsequent reticence, coupled with this, have given rumors to the effect that they had concocted a scheme to meet at some appointed time and place, and have gone together. For the lady's sake it is but proper to give but little credence to such a suspicion until further developments shall prove it well founded."

It seems to us no intelligent person can read this article without seeing that its necessary effect was to disgrace and degrade *Mrs. Beckwith* in public estimation and esteem; to lower her in, or to exclude her from, society; and to bring her into contempt and ridicule. The learned counsel for the defendants insists that there is nothing in the publication which charges that Howard and *Mrs. Beckwith* went away for any criminal, unlawful or illicit purpose. It is true, the article does not impute to *Mrs. Beckwith* any sexual immorality or criminal conduct; but it does directly charge, or imply, that she had either gone away with, or had appointed a time and place to meet, a man, who, it was alleged, had committed forgery, had been guilty of frauds, had betrayed his friends, had deserted his family; who was, in short, a man of such a character that no respectable woman could associate with him anywhere without social degradation; or without, as the books say, bringing her into hatred, contempt and ridicule. Indeed, it seems to us that no charge — except, perhaps, the imputation of being an unchaste woman, — was better calculated to injure the reputation of *Mrs. Beckwith*, and impair her standing in society, than the conduct attributed to her in the publication. If she was not his accomplice or confederate, she certainly could not secretly go off with, or make arrangements to meet anywhere, a man such as Howard is represented to be, without placing herself in a most odious and degrading connection. There can be no doubt that, upon well settled principles, a publication which imputes to her such conduct is libelous. *Rice v. Simmons*, 2 Harr., 417; *Colby v. Reynolds*, 6 Vt., 489.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for further proceedings according to law.